AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

V.

DENNIS QUIRK

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 05-mj-00030

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about March 2005 to June 16, 2005 in Middlesex and Suffolk county, in the District of Massachusetts defendant(s) did, (Track Statutory Language of Offense) attempt and conspire to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by robbery, and did use and carry during and in relation to, and possess in furtherance of, a crime of violence, firearms

in violation of Title 18 United States Code, Section(s) 1951(a) and 924(c).

I further state that I am a(n) Special Agent, FBI and that this complaint is based on the following
                                   Official Title
facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof: ☒ Yes  ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

06-17-2005                at                Boston, Massachusetts
Date                                        City and State

LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE                _____
Name & Title of Judicial Officer               Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT OF ~~LAURENCE TRAVAGLIA~~ Eric Toole

I, Eric Toole, having been duly sworn, do hereby depose and say, that:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed for almost 5 years. I am currently assigned to the Boston Bank Robbery Task Force, which is comprised of personnel of the FBI, the Massachusetts State Police, and the Malden, Boston and Cambridge Police Departments. During the course of my career as an FBI special agent, I have been involved in numerous investigations involving bank and armored car robberies.

2. I am aware that Title 18, United States Code, Section 1951, the Hobbs Act, makes it a crime for anyone to obstruct, delay, or affect commerce by committing or attempting to commit a robbery. I am aware that Title 18, United States Code, Section 924(c) makes it a crime to use or carry a firearm during or in relation to a crime of violence, or to possess a firearm in furtherance of a crime of violence. Having so said, I make this affidavit in support of a criminal complaint charging DENNIS QUIRK with violations of 18 U.S.C. §§1951(a), 924(c) ~~and 922(g)(1).~~

3. The facts stated herein are based on my own personal involvement in this investigation, as well as my discussions with other law enforcement officers also involved in the investigation. In submitting this affidavit, however, I have not

included each and every fact known to me about the investigation, but only those facts which I believe are sufficient to establish the requisite probable cause.

4. On April 26, 2005, a Cooperating Witness ("CW")[1], who has previously provided reliable information to FBI Special Agent Laurence Travaglia and other law enforcement agents leading to at least one arrest and conviction, provided the following information:

a. CW learned from JASON OWENS that DENNIS QUIRK, MARTY O'BRIEN, ARTHUR BURGESS and BRIAN LACEY intended to rob an armored car the morning of April 27, 2005. OWENS showed CW a

---

[1] The CW has not received any promises, rewards, or inducements in connection with his assistance in this matter, other than that arrangements will be made to relocate him if such appears prudent. The CW has admitted to long-time use of controlled substances, including but not limited to heroin and crack cocaine. The CW also has a criminal history, including but not limited to convictions for credit card misuse, attempting to commit a crime, breaking and entering a motor vehicle or boat in the daytime, receiving stolen property, and larceny, all sustained in 2004; convictions for larceny, uttering checks, and forgery, all sustained in 2002; convictions for possession of a class A substance and a hypodermic needle or syringe, sustained in or around 2000; convictions for assault and battery with a dangerous weapon, assault and battery, conspiracy, and larceny, sustained in 1998; convictions for obstructing justice, receiving stolen property, and possession of a hypodermic needle or syringe, sustained in 1998; convictions for three counts of armed robbery, three counts of larceny, and larceny of a motor vehicle, sustained in 1987; convictions for armed robbery and assault and battery, sustained in 1986; and convictions for assault and battery on a police officer and aiding an escape, sustained in 1986. The CW also has juvenile adjudications for assault to rob, assault and battery, and assault and battery with a dangerous weapon.

black NIKE zip-up bag which contained two or three bullet-proof vests, a Chinese model AK-47 assault rifle and a MAC-11, a carbine. CW described the Chinese model AK-47 as an older model, brown in color, "wooden", with duct tape on the front of it. CW stated that there were two magazines for the AK-47 which were duct taped together. CW described the MAC-11 as being "brand new." CW stated that the MAC-11 had some type of a gray attachment which went on the barrel. CW stated that the attachment looked like a silencer, but OWENS told the CW that it was a flash suppressor. CW observed one long magazine for the MAC-11. OWENS told the CW that the vests were BRIAN LACEY'S. CW believed that OWENS was holding this bag for the aforementioned persons.

    b. CW stated that OWENS lives at 311 Pearl Street, Second Floor, Malden, Massachusetts. OWENS is currently using a NEXTEL cell phone with Telephone Number, (617) 593-0139. CW explained that this cell phone is not in OWENS' name, but rather, in the name of a "shuttle" company.

    c. CW described 311 Pearl Street as a "sober house." CW stated that five persons, in addition to OWENS, live at the sober home. CW stated that, based upon conversations with OWENS, the individuals involved in the robbery were planning to go back to OWENS' house after the robbery.

    d. CW learned that OWENS was to get twenty-five hundred

3

dollars ($2500) from the crew after the robbery for holding the weapons.

  e. CW stated that on the morning of April 27, 2005, JASON OWENS had everybody out of his apartment by 8:30 a.m. At approximately 3:45 p.m. on April 27, 2005, CW met with OWENS back at 311 Pearl Street. OWENS told CW that at approximately 9:00 a.m. that morning, QUIRK called OWENS, advising that he was "disgusted." QUIRK explained that the robbery was not going to happen because one of the participants had gotten cold feet. QUIRK apologized to OWENS because he owed OWENS twenty-five hundred dollars ($2500). QUIRK told OWENS that he would meet him that evening in Charlestown to talk to him about what happened. OWENS told CW that he was going to meet QUIRK that evening between 6:00 and 7:00 p.m. On April 27, 2005, at approximately 6:30pm Boston Police Detective Paul Barnicle observed QUIRK at the Dunkin' Doughnuts located at the Bunker Hill mall in Charlestown talking on his cell phone.

  f. On May 3, 2005, CW had a recorded conversation with JASON OWENS. During this conversation OWENS indicated that the robbery had been postponed and that it would take place at a later date. Among other things, OWENS indicated that he had sold the guns to QUIRK and not merely held them. During this conversation CW inquired as to why the robbery had been postponed. OWENS indicated that 'Marty', referring to MARTY O'BRIEN, had gotten

4

cold feet. I have personally listened to this recording.

    g. In a conversation which the CW had with OWENS on May 18, 2005, CW told OWENS that the CW needed a favor from him. CW stated to OWENS that he needed "a little something" for himself referring to a handgun. OWENS told the CW that he did not have one to sell him, but, did not think it would be a problem to find one. OWENS then made the comment that he recently sold his gun to someone for four hundred dollars. CW explained that OWENS was referring to the twenty-five automatic with which OWENS shot someone.

    h. CW recently asked JASON OWENS how "D," referring to DENNIS QUIRK, was doing. OWENS responded that he and QUIRK had a argument a few days ago and were not speaking. OWENS was told by QUIRK, that he and his crew were set up and ready to pull a robbery when he noticed a black LINCOLN Navigator with tinted windows driving in the area. QUIRK then noticed some type of a CHEVY with tinted windows also in the area. After observing these two vehicles, QUIRK surveilled the area more closely and discovered several other vehicles with tinted windows which looked suspicious. QUIRK told OWENS "they were going to ambush us. If we did the job, they would have grabbed us. We had to abort."

    i. QUIRK confronted OWENS demanding to know who OWENS told about the planned robbery. OWENS put it back on QUIRK, telling

QUIRK that he's been so screwed up on drugs lately that he probably told someone about the robbery. OWENS told QUIRK that QUIRK probably told one of the fifteen year old girls that he's been hanging around with. In relaying the story to the CW CW, OWENS stated that the only person he told about the robbery was the CW. OWENS, however, never accused the CW of being a rat. CW reported that since this incident, QUIRK has kept an extremely low profile.

**The Events of June 16, 2005**

5. At approximately 11:38 a.m. on Thursday June 16, 2005, a Loomis Fargo armored car was making a delivery/pickup at the Citizens Bank on Hanover Street in the North End of Boston. There were three Loomis/Fargo employees, a driver, a messenger and a guard. When the Loomis/Fargo vehicle arrived at the location, the messenger opened up back door and start unloading coin out of the armored vehicle. At that time, the messenger heard a car revving its engine and heard tires screeching. The messenger looked up to see a blue minivan which pulled up along side the armored vehicle. The side door of the minivan vehicle opened and a person, wearing a mask, pointed what appeared to be an AK-47 and said "Get the fuck down." The messenger ran to a nearby store and drew his weapon. The messenger came out of the store and saw the minivan pulling away from the location. Witnesses in the vicinity of armored vehicle saw the minivan

travel from Hanover Street to Parameter Street. The vehicle was then seen to take a right onto Salem Street and then a left onto Cooper Street. Masked individuals were seen exiting the minivan; one witness observed one of the individuals carrying a gun. The individuals were then seen entering a red car.

6. At approximately noon, an Everett town employee saw a red Buick pull up and three white males jump out, all of them wearing headgear. The three individuals then jumped in to a white van, leaving the red Buick there with the motor running, in the middle of the intersection of Tileston and Williams Street in Everett. The individuals were seen getting into a white van. He did not observe windows on the body of the ~~truck~~. van.

7. Upon learning of the attempted armored car robbery, and in light of the information previously developed and related agents proceeded to the vicinity of 311 Pearl Street in Malden. Upon arriving, Special Agent April Haddock observed a man wearing a dark hooded jacket, dark ball cap, and blue jeans standing outside of 311 Pearl Street looking around in all directions. She recognized him to be Martin O'Brien. After a few minutes, he entered 311 Pearl Street. Shortly thereafter, someone wearing a white hat, white shirt, and shorts, was seen exiting the house. A chase ensued involving FBI special agents and the Malden Police. The individual was apprehended in a nearby MBTA station and was identified as Dennis Quirk. He was found in possession

of a knife and arrested by the Malden Police. A neighborhood canvass of the area in and around the 311 Pearl Street location was conducted. This search disclosed a white Econoline van, bearing Massachusetts registration 6305FF was found approximately 4 blocks away from the Pearl Street residence. NCIC records disclosed that this vehicle was stolen yesterday.

8. Subsequent to this attempted robbery, one of the Loomis Fargo armored car guards was interviewed. Your affiant was informed by the interviewing Detective that the guard indicated that he was confronted by a masked individual brandishing an AK-47 assault rifle which had a light brown or tan wooden stock, and a large magazine. This guard is licensed to carry firearms in the state of Massachusetts, is familiar with, and has fired an AK-47.

9. On the evening of June 16, 2005, a search was conducted pursuant to a search warrant of the second floor apartment of 311 Pearl Street, Malden, Massachusetts. Law enforcement officers recovered from the closet of the front bedroom used by JASON OWENS a black NIKE zip-up bag and, from within that bag, two bullet-proof vests, an AK-47 style assault rifle, a MAK-11 with appeared to be a silencer attached, and a semi-automatic pistol.

10. On the evening of June 16, 2005, JASON OWENS, after being advised of his <u>Miranda</u> rights and waiving said rights, spoke to law enforcement officers. Among many other things,

OWENS told us, in substance, that he had allowed QUIRK, BURGESS, and O'BRIEN access to his apartment at 311 Pearl Street, including by providing them with a key, and permitted them to store firearms and other items for use in armored car robberies. He told us, in substance, that QUIRK specifically discussed with OWENS last week QUIRK's intention to commit an armored car robbery with BURGESS and O'BRIEN on the following Thursday, June 16, 2005, outside of Charlestown. OWENS agreed to let them use his apartment after the robbery as a rendevous point.

11. Based upon the foregoing, I believe that there is probable cause to believe that DENNIS QUIRK did attempt and conspire to obstruct, delay and affect commerce and the movement of articles and commodities in commerce, by robbery, in violation of 18 U.S.C. Section 1951(a), and did use and carry firearms during and in relation to, and possess firearms in furtherance of, a crime of violence, in violation of 18 U.S.C. §924(c).

ERIC TOOLE
SPECIAL AGENT, F.B.I.

Sworn and subscribed to before me this seventeenth day of June, 2005.

LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

9